*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

JASON MAXEY and BETHANY MAXEY,

Plaintiffs-Appellees,

v

BOTSFORD GENERAL HOSPITAL,
PROGRESSIVE HEALTH CARE, MICHAEL
HAROUTUNIAN, WILLIAM RUDY, DAVID
GREEN, and WILLIAM BOUDOURIS,

Defendants,

and

GLENDALE NEUROLOGICAL ASSOCIATES,
PC, and ROBERT PIERCE,

Defendants-Appellants.

UNPUBLISHED
August 22, 2019

No. 341988
Oakland Circuit Court
LC No. 2015-148616-NH

JASON MAXEY and BETHANY MAXEY,

Plaintiffs-Appellees,

v

BOTSFORD GENERAL HOSPITAL,

Defendant-Appellant,

and

PROGRESSIVE HEALTH CARE, GLENDALE
NEUROLOGICAL ASSOCIATES, PC,
MICHAEL HAROUTUNIAN, WILLIAM RUDY,
DAVID GREEN, ROBERT PIERCE, and

No. 341992
Oakland Circuit Court
LC No. 2015-148616-NH

-1-

WILLIAM BOUDOURIS,

    Defendants.

_____

Before: SHAPIRO, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

In these consolidated appeals, defendants Robert Pierce, D.O., and Glendale Neurological Associates (collectively the Glendale defendants) and defendant Botsford General Hospital (Botsford) appeal by leave granted the trial court's orders denying their joint motion for entry of final judgment, and denying their motions in limine to exclude expert testimony of Dr. Gregg Zoarski, M.D. Botsford also appeals by leave granted the trial court's order denying its motion for leave to file a late motion for summary disposition after a scheduling order's cut-off date. For the reasons stated below, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiff Jason Maxey (Maxey), then age 37, suffered a debilitating stroke on February 18, 2013. At the time of the stroke he was a patient at Botsford, having arrived at the emergency department on the prior day, February 17, 2013. According to the medical records, Maxey developed a very bad headache on February 17; his symptoms grew to include visual distortion, facial asymmetry, slurring of speech and eventually restrictions on his ability to use the left side of his body. By the time he arrived at the emergency room the worst of these symptoms had resolved and there are significant disputes concerning the course of his symptoms over the next 24 hours. The emergency department physicians viewed Maxey's condition as most likely due to a TIA (transient ischemic attack) and admitted him to the hospital for further observation and treatment. His attending physician was defendant Dr. William Rudy, an internal medicine specialist and he was also seen and treated by defendant Dr. Robert Pierce, a specialist in neurology.

A standard CT of the brain was performed in the emergency department and was read as normal. Plaintiffs' experts testified that a standard CT was inadequate to rule out arterial pathology and that once Maxey had been admitted, Drs. Rudy and/or Pierce should have promptly ordered a computed tomography angiograph (CTA), an imaging study that more fully and clearly visualizes the arteries and blood flow to and within the brain. They testified that without this more detailed study it was not possible to determine if the patient had any ongoing obstruction or restriction of blood flow to and in the brain and that the failure to order it was malpractice. They also point to the results of a carotid artery ultrasound performed at about 1:00 p.m. on February 18. The ultrasound revealed an abnormality of the right carotid artery. Moreover, the radiologist who performed the ultrasound concluded that further, more detailed imaging should be performed and specifically recommended that a CTA be ordered. As noted, however, defendants did not order the CTA.

About 5 hours after the ultrasound, at about 6 p.m., Maxey was found on the floor next to his hospital bed unable to move his left arm. An MRI and an MRA (magnetic resonance angiography) were performed at about 10 p.m. revealing a large, irreversible right hemisphere stroke in the distribution of the middle cerebral artery.[1]

For purposes of this appeal, defendants do not contest that the stroke was the result of a blockage in the middle cerebral artery that was caused when either a thrombus (blood clot) in his right carotid artery[2] extended into the cerebral artery or a piece of the thrombus broke off, i.e., embolized, and traveled up into the cerebral artery where it lodged.

Plaintiffs brought suit in August 2015, alleging that Dr. Rudy, the attending internal medicine doctor, and Dr. Pierce, the consulting neurologist, acted negligently by failing to timely and properly treat Maxey for an ischemic stroke. Pertinent to these appeals, plaintiffs alleged that a CTA "was recommended, but never ordered and/or performed." They averred that the physicians breached their duties by failing to "[p]erform and/or obtain a neurological work-up" of Maxey, order appropriate tests including a "head CT angiography," and to refer to an appropriate specialist for various treatment modalities including an embolectomy and a carotid endarectomy. These standard of care allegations were supported by affidavits of merit executed by Dr. Neil Farber (internal medicine) and Dr. Nancy Futrell (neurologist) each of which also averred that "as a direct and foreseeable consequence of the negligence of the above-listed health care providers, Mr. Maxey's blood vessels were allowed to become occluded, through the embolic event, and/or other occluding event, which cut off his blood supply to numerous anatomical structures, including, but not limited to, portions of his brain which resulted in a severe stroke."

During discovery, plaintiffs identified another expert, Dr. Zoarski, who is a board certified neuroradiologist and performs neurointerventional surgical procedures. He testified at his May 24, 2017 deposition that a head CTA should have been conducted immediately upon admission given Maxey's symptoms and complaints. He stated that had the CTA been performed it would have shown substantial abnormality of the right internal carotid artery most likely a dissection and resulting thrombus that partially occluded a branch of the cerebral artery. Dr. Zoarski further testified that

> the range of options that could be applied in this circumstance would include elective occlusion of the internal carotid artery, which is sometimes done to

---

[1] The MRI and MRA reports are not in the record. However, according to the complaint, these studies, performed on Maxey after the stroke occurred revealed "a suspected occlusion of the right internal carotid artery, and right middle cerebral artery" as well as "evidence of restricted diffusion involving a large portion of the right cerebral hemisphere within the MCA [main carotid artery] distribution." Defendants have not indicated that they dispute this description.

[2] The thrombus in the carotid artery was caused due to a dissection of the artery, i.e. a separation between layers of the arterial wall, which restricts normal blood flow and causes clotting.

prevent embolization[,] [s]tenting and revascularization or reconstruction on the internal carotid artery [or] [t]hrombectomy of the middle cerebral artery . . . .

Plaintiffs maintained that had the appropriate neurointerventional procedure been undertaken, the stroke would have been avoided.

On May 31, 2017, defendants filed motions for summary disposition pertaining to three other means of treatment that plaintiffs claimed would have avoided the stroke: administering tPA, administering heparin and better management of Maxey's heartrate and blood pressure. Defendants argued that there was inadequate evidence to show that three of the options were more likely than not (greater than 50%) to have prevented the stroke. The trial court agreed and dismissed the three theories discussed in defendants' motions.[3] However, the court stated in its order that it "makes no conclusion regarding the alleged failure to consult a neuro-radiologist because Dr. Pierce and Glendale did not move for summary disposition on that issue; the issue was only brought up in the response and the reply."

Despite the court's order noting that it had not dismissed this theory, defendants then moved for entry of final judgment claiming that the trial court had dismissed all of plaintiffs' causation theories. Plaintiffs opposed entry of judgment, asserting that defendants ignored plaintiffs' theory regarding defendants' "failure to timely consult an interventional neuroradiologist," and the causation testimony of Dr. Zoarski. In addition to relying on Dr. Zoarski's deposition testimony, plaintiffs' answer was accompanied by an October 6, 2017 affidavit from Dr. Zoarski, in which he reiterated that consultation with an interventional neuroradiologist would likely have prevented Maxey's stroke. In the affidavit, Dr. Zoarski identified the specific abnormalities that the CTA could have detected and set forth the corresponding endovascular treatment for each abnormality.

Defendants replied that this causation theory was never pled by plaintiffs and was not supported by Dr. Zoarski's deposition testimony. Defendants also argued that Dr. Zoarski's affidavit contradicted his previous deposition testimony and could not be used to avoid dismissal of plaintiffs' action.

The trial court considered defendants' joint motion for entry of final judgment without oral argument and denied it in an October 17, 2017 order reading:

---

[3] This matter was previously before us concerning plaintiffs' theory that he should have been timely treated with tPA which can reduce or eliminate clots. We reversed the trial court's dismissal of that theory and remanded for a *Daubert* hearing. *Maxey v Botsford Hosp*, unpublished order of the Court of Appeals, entered April 5, 2018 (Docket No. 340812). After the *Daubert* hearing the trial court concluded that there was inadequate scientific support for the claim that earlier treatment with tPA would have provided a greater than 50% chance for a better outcome. We denied plaintiffs' application for leave to appeal that decision. *Maxey v Botsford Gen Hosp*, unpublished order of the Court of Appeals, entered July 17, 2019 (Docket No. 348363).

The plaintiffs' Complaint and Affidavit of Merit allege the requisite standard of care, breach, injury, and proximate causation regarding the timely consultation with an interventional neuroradiologist. Further, the defendants' request for relief should have been requested pursuant to a motion brought under MCR 2.116.

The court also denied Botsford's motion for reconsideration.

By that time, the summary disposition motion cut-off had passed. Botsford filed a motion for leave to file a late motion for summary disposition. The trial court denied this request in an October 24, 2017 order.

Having failed to raise the issue in a timely motion for summary disposition and its motion for leave to file such a motion beyond the deadline having been denied, defendants then filed motions in limine to preclude endovascular intervention testimony from Dr. Zoarski. They argued that Dr. Zoarski's deposition did not support the theory, that his affidavit should not be considered and that his testimony at trial should peremptorily be limited to the statements in his deposition. They also argued that Dr. Zoarski's conclusions were not supported by the factual record and that they did not meet the requirements of MRE 702 and MCL 600.2955. Defendants alternatively requested a *Daubert* hearing on the scientific support for Dr. Zoarski's conclusions and attached numerous medical journal articles that they asserted showed a low success level for surgical endovascular treatments in improving the outcomes for stroke patients. Plaintiffs responded to defendants' motions in limine and attached medical journal articles that he asserted showed a higher rate of success for such procedures.

The trial court heard defendants' motions in limine at a hearing held on November 29, 2017, and took the matter under advisement. In separate orders issued on January 2, 2018, the court denied the motion to preclude or limit Dr. Zoarski's testimony, noting that if defendants concluded that Dr. Zoarski's trial testimony was inconsistent with his deposition he could be impeached with those prior statements. The court did, however, grant the request to strike Dr. Zoarski's affidavit and did not consider it for purposes of the motions in limine. The order denying the Glendale defendants' motion in limine states:

The request to strike any and all testimony and opinions of Dr. Zoarski and any expert relating to endovascular intervention is denied.

The request to limit Dr. Zoarski's opinions to those set forth in his deposition testimony if he testifies live at trial is denied. The moving party may impeach Dr. Zoarski with any contradictory testimony.

The request to strike the post deposition affidavit of Dr. Zoarski is granted.

The order denying Botsford's motion in limine states:

The request to preclude the endovascular proximate causation opinion of Gregg Zoarski, MD is denied. The alternative request for an evidentiary hearing is denied.

Neither order includes any further explanation regarding the trial court's reasoning.

## II. ANALYSIS

## A. MOTION FOR ENTRY OF JUDGMENT

Before turning to the substantive issue, we consider defendants' argument that the trial court reversibly erred by denying their joint motion for entry of judgment under MCR 2.602.

We find no merit in defendants' argument. As the trial court pointed out, defendants' motions for summary disposition failed to seek dismissal of the claim that endovascular surgery would have prevented Maxey's stroke. Because defendants did not raise it, the trial court made no ruling regarding it and defendants were not entitled to a judgment of dismissal. Further, defendants' argument that this was a new, previously unpleaded theory is not consistent with the record. As the trial court stated in its order, defendants had adequate notice of a theory involving failure to consult an interventional radiologist and could have addressed it in their motions for summary disposition. The complaint alleges that Drs. Pierce and Rudy should have ordered a CTA and referred the patient for the procedures described later in Dr. Zoarski's deposition. Also, Dr. Zoarski had testified at length concerning this theory at a deposition conducted a week before the deadlines for motions for summary disposition and so the defendants were fully aware of the theory. Under these circumstances, the trial court did not err by denying defendants' motion for entry of judgment; that ruling plainly within the court's discretion.

## B. MOTIONS IN LIMINE

Defendants also argue that the trial court erred by denying their motions in limine to preclude Dr. Zoarski from offering his opinion that Maxey more likely than not would have benefited from endovascular interventions by an interventional neuroradiologist.

We review a trial court's decision on a motion in limine for an abuse of discretion. *Bellevue Ventures, Inc v Morang-Kelly Investment, Inc*, 302 Mich App 59, 63; 836 NW2d 898 (2013). A trial court's decision whether to admit expert testimony is also reviewed for an abuse of discretion. *Gay v Select Specialty Hosp*, 295 Mich App 284, 290; 813 NW2d 354 (2012). Such a standard is highly deferential and a trial court shall be found to have abused its discretion only when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017); *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016). Though the trial court did not grant defendants' motions in limine as to trial testimony, it struck Dr. Zoarski's post-deposition affidavit for purposes of deciding the motions. In reviewing the trial court's decision, therefore, we will not consider the content of the affidavit.

Having reviewed Dr. Zoarski's deposition in full we, like the trial court, are satisfied that his testimony was sufficient to deny the motion to bar his testimony concerning neuroradiological intervention. Defendants cite to passages in the deposition where Dr. Zoarski states that he cannot say which of several possible endovascular procedures would have been successful because a CTA (the study plaintiffs allege should have been performed) was never performed and so the exact nature and location of the clotting could not be known with certainty. However, later in his deposition he stated his opinion that the CTA would have revealed either

an embolism in the middle cerebral artery or a thrombus in the right carotid artery or both given what was found on the post-stroke MRI. He stated:

> [D]epending on [the] appearance [of the CTA], whether there was any residual lumen or whether it was completely occluded, in conjunction with the patient's clinical picture . . . [,] the range of options that could be applied in this circumstance would include elective occlusion of the internal carotid artery, which is sometimes done to prevent embolization. Stenting and revascularization or reconstruction of the internal carotid artery. Thrombectomy of the middle cerebral artery, which can be performed by going antegrade through the right injured carotid artery, or going up the contralateral left internal carotid artery and coming across the anterior communicating artery. So there are a variety of things that could have been done.

In sum, Dr. Zoarski testified that in 2013 there were endovascular procedures for each of the conditions that could have been shown on the CTA. He specifically opined that if in the hours before the stroke the worsening clot was located in the middle cerebral artery it could have been removed by a interventional neuroradiologist using either "a MERCI retriever or penumbra aspiration" and that if the clot had not yet migrated to the cerebral artery but was still in the carotid artery, it could have been removed by a thrombectomy. So contrary to defendants' argument, Dr. Zoarski's deposition defined and explained this causation theory.

To the degree that Dr. Zoarski made inconsistent statements concerning his opinions, defendants may use those statements to impeach him at trial. However, we reject defendants' argument that Dr. Zoarski should be wholly barred from testifying in support of this theory. Defendants point to several points in the deposition where Dr. Zoarski said that he cannot state that any one of the procedures would have been successful. When asked if he had an opinion "which of the range of options would have been most likely," he answered that without CTA imaging detailing the location and extent of pathology prior to the stroke he could not state which of the procedures he would have recommended. He was then asked which of the enumerated options "would have been required." Dr. Zoarski responded that "I can't give you an opinion on that" and answered affirmatively when asked, "[B]ecause they didn't do a CT angiogram, whether or not any of those . . . range of options would have been selected or not, we just can't know?" However, he stated that the MERCI device was shown to have an approximately "90 percent success in thrombectomy." Dr. Zoarski also testified as follows:

> *Q.* Do you believe that the stroke was still preventable at 1 p.m. when the carotid ultrasound report came back?
>
> *A.* Yes
>
> *Q.* On the 18th, to clarify?
>
> *A.* Yes. Absolutely.
>
> *Q.* And what do you believe could have been done at that point?

*A.* . . . . [T]here were a number of things that could have been done *that would have more likely than not led to a good outcome*. [Emphasis added.]

On further questioning, Dr. Zoarski stated that "[w]e don't know what the CTA looks like. So I can't tell you if he was or was not or would or would not benefit from any intervention." Defendants point to this statement as dispositive. However, reading the statement in context it is clear that Dr. Zoarski was making the point that because the location and precise nature of the pathology was not fully determined by CTA he did not know which of the procedures were indicated and so could not say *which* of them was likely to succeed. He went on to state that

> the CTA could be abnormal in a multitude of different ways. . . . If his deficits are due to distal embolization to the MCA, then you need to make a determination of whether you address those emboli by coming up the contralateral carotid artery and going across to try to remove or dissolve the emboli in the MCA by crossing over to the left side from the right carotid. Or whether you reopen the carotid artery in order to get to the emboli. . . . So I mean again, depending on what the findings are, there are a number of responses.

Ultimately, when Dr. Zoarski was asked whether "you believe that you could have, or someone like you in 2013 would have prevented a stroke," he stated, "The answer is yes."

The deposition, taken in its entirety, makes clear that Dr. Zoarski believed that one of the procedures he outlined would have been successful in preventing a stroke, but that which one should have been undertaken cannot be determined given that no CTA was ordered despite the recommendation following the ultrasound. Moreover, defendants' argument amounts to the claim that because they neglected to order the CTA the absence of the information it would have provided effectively immunizes them from suit. We decline to adopt such an approach, particularly where there is detailed testimony about the possible results of that study and the nature of treatment those results would indicate. More to the point, the trial court's decision did not fall outside the range of reasonable and principled outcomes and so there was no abuse of discretion.

We next consider defendants' argument that there is inadequate scientific support for Dr. Zoarski's view that an endoscopic procedure would have had a greater than 50% chance of preventing or reducing the effect of the stroke.

The trial court serves as "gatekeeper" in determining the admissibility of expert evidence. *Chapin v A&L Parts, Inc*, 274 Mich App 122, 126; 732 NW2d 578 (2007). MRE 702 "requires the circuit court to ensure that each aspect of an expert witness's testimony, including the underlying data and methodology, is reliable." *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016). Also, under MCL 600.2955(1) the trial court must decide whether a proposed scientific opinion is sufficiently reliable to allow its submission to the jury.

Here, the trial court declined to hold a *Daubert*[4] hearing to determine the reliability of Dr. Zoarski's opinion.  Nor did the court make any express findings as to the reliability of Dr. Zoarski's opinion regarding endovascular intervention.  The parties have presented a substantial amount of competing literature on this topic.  In the absence of a hearing and findings made by the trial court, we are not in position to conduct a meaningful appellate review of this issue.  Accordingly, we reverse the part of trial court's order declining to hold an evidentiary hearing and remand for a *Daubert* hearing.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle

---

[4] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).